UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF MONTANA

| | |
|---|---|
| In re<br><br>**NORTH END TIMBER PRODUCTIONS LLC**,<br><br>Debtor. | Case No. **06-60440-7** |
| **THREE RIVERS BANK OF MONTANA**,<br><br>Plaintiff.<br><br>-vs-<br><br>**NORTH END TIMBER PRODUCTIONS LLC**, **STEEL ETC LLP, DISMISSED**, and **JOHNSON BROTHERS CONTRACTING, INC**,<br><br>Defendants. | Adv No. **07-00014** |

# MEMORANDUM OF DECISION

At Butte in said District this 17th day of December, 2007.

North End Timber Productions LLC ("NET") filed a chapter 11 bankruptcy case on June 13, 2006. The Court converted the case to a chapter 7 case on April 2, 2007. Three Rivers Bank of Montana ("TRB"), a creditor of NET, filed this adversary proceeding on February 27, 2007, requesting this Court to grant declaratory relief in determining that Johnson Brothers Contracting, Inc. ("JBC")'s interest in $150,000 of insurance proceeds is subordinate to TRB's interests by virtue of TRB being named a loss payee on the insurance policy, or alternatively that

1

JBC's interest in the proceeds only extends to the reasonable value of JBC's collateral destroyed in the NET's fire.  TRB further requested that a judgment be entered against Steel Etc. LLP allowing TRB to receive $15,000 in proceeds through foreclosing its security interest in salvaged steel and iron that would otherwise be payable to Steel Etc. LLP for debris removal.  No relief was requested initially against Jobs Now, Inc., formerly Northwest Montana Human Resources, Inc.  Jobs Now, Inc. ("JNI"), filed an answer, counterclaim and cross claim.

Upon settlement by the parties, Steel Etc. LLP was dismissed from the litigation.  The parties further stipulated in the approved final pretrial order that NET should be dismissed from this proceeding by stating the following:  "Defendant NET should also be dismissed from the action, as it has not made an appearance in the matter and the Chapter 7 trustee informs counsel for the Bank that the Estate asserts no claim to the $150,000 in insurance proceeds."  Based on this stipulation, the Court will dismiss NET from this proceeding.

This Court set this proceeding for trial on September 11, 2007.  The parties filed a proposed pretrial order that the Court approved.  At the trial, the parties informed the Court that only issues of law remain given the agreed statement of facts contained in the approved final pretrial order and given the stipulation by the parties that all exhibits submitted by the parties could be admitted by the Court.  TRB's Exhibits 1 through 9 (Doc. # 32) and TRB's amended Exhibit 3 (Doc. # 38), and TRB's amended Exhibits A through C (Doc.# 43),  JBC's Exhibits A through F (Doc. # 29), and JNI's Exhibits AA through HH (Doc. ## 33 and 40) are all admitted.  The Court after the trial took this proceeding under advisement.  After reviewing the facts and the law, the Court is ready to issue a decision.  This memorandum contains the Court's findings of fact and conclusions of law.

2

## JURISDICTION

Subject matter jurisdiction of this matter arises under 28 U.S.C. § 1334(b) and referral to this Court is proper pursuant to 28 U.S.C. § 157. Venue is proper pursuant to Mont. LBR 5001-2.

## FACTS

The parties submitted the following agreed facts in the approved final pretrial order:

1. North End Timber Production, LLC ("NET"), is the debtor in the underlying bankruptcy (Case No. 06-60440-RBK) to which this adversary action is related.

2. NET previously operated a lumber mill in Olney, Montana.

3. In August 2006, a fire occurred at NET's mill which destroyed a substantial amount of its equipment.

4. At the time, NET was insured by Chubb Custom Insurance Company under Policy No. 794996-26 (the "Chubb Policy").

5. The Chub Policy provided, inter alia, coverage for loss of personal property with limits of $998,350.

6. The [Three Rivers Bank of Montana (TRB") and Jobs Now, Inc., formerly Northwest Montana Human Resources, Inc. ("JNI")] were endorsed as loss payees on the Chubb Policy.

7. Although the October 1, 2005, security agreement between [Johnson Brothers Contracting, Inc. ("JBC")] and NET required that JBC also be endorsed as a loss payee on the Chubb Policy, JBC was not so named.

8. The Chubb Policy paid limits for personal property destroyed in the fire, although

the payment was not tied to any specific equipment. At issue in this litigation and on deposit with the Court is $150,000 of those insurance proceeds.

9. The TRB, JBC, and JNI are all perfected secured creditors of NET in the bankruptcy and have general liens on all personal property equipment owned by NET.

10. Under the UCC, these liens also cover any insurance proceeds for the collateral covered by each creditor's lien.

11. TRB perfected its security interest first; JNI second; and JBC third.

12. Due to its earlier filing, TRB's interest in the insurance proceeds is superior to JNI.

13. On July 15, 2005, the TRB and JBC agreed as follows:

> Three Rivers Bank of Montana agrees to subordinate to Johnson Brothers Contracting the attached list of mill machinery and equipment until the $300,000 is paid in full by John G. Alt and North End Timber Productions, LLC. All other machinery, equipment, assignments, agreements, covenants, note renewals, and conditions will remain in force.

14. JNI did not enter into any subordination agreement with JBC.

15. Of the equipment destroyed in the fire, $104,000 worth was listed in the July 15, 2005, Subordination Agreement between the TRB and JBC and identified in JBC's lien.

16. An additional $50,000 of damage occurred to wiring and support structure at NET.

## ADDITIONAL FACTS

In reviewing the exhibits, particularly Exhibit ("Ex.") F, the Court finds under section 15(a), page 8, that NET, as a condition of the security agreement between NET and JBC, was to have TRB and JNI each release their respective security interests, if any, in the collateral

4

described in an attachment to the agreement. TRB filed secured proof of claim no. 9-1 in the amount of $46,759.73, and secured proof of claim no. 10-2 in the amount of $599,719.11. JNI filed secured proof of claim no. 14-1 in the amount of $172,977.19. No objections have been filed to these claims.

## CONTENTIONS

The parties' contentions are set out in the approved final pretrial order and are as follows:

TRB does not seek to impose liability on either JBC or JNI. Instead, it seeks a declaratory judgment that it has priority interest to the $150,000 in insurance proceeds on deposit with the Court because it was a named loss payee on the Chubb Policy and never subordinated its interest in the insurance proceeds. In the alternative, if JBC has priority due to the TRB's subordination, that priority only extends to the $104,000 in specified equipment and it does not extend to the $50,000 in wiring and support structure.

JNI asserts that should TRB maintain its first priority position to the $150,000, it should receive the funds, with any surplus funds to be paid over to JNI, as holder of the second priority claim. However, should the TRB have given up its first priority position by signing a Subordination Agreement, then JNI's priority claim moves to first position against the amount in dispute, and it receives all funds before TRB or JBC receive funds.

JBC asserts that TRB subordinated its first position with respect to the collateral subject to the Subordination Agreement and JBC is therefore entitled to the $150,000 on deposit with the Court. If JBC is not entitled to anything for the wiring and support structure, then it is entitled to $104,000. JBC does not take a position with respect to the remaining $46,000.

## LEGAL ISSUES

From the foregoing facts and contentions, the following legal issues arise:

Does JBC have a lien, whether equitable or based on Article 9 or any other right, on the insurance proceeds due to the fact that NET failed to name JBC as a loss payee, although required under its security agreement with NET?

Does a named loss payee on an insurance policy have a direct contractual interest in insurance proceeds that is superior to either a UCC or equitable lienholder's interest in the same proceeds?

Did TRB subordinate its interest in the insurance proceeds to JBC?

Is JNI's interest in the insurance proceeds superior to JBC's?

If JBC's lien has priority, does its priority extend to the wiring and support structure not identified in the Subordination Agreement with the Bank?

## DISCUSSION

Before the Court considers each legal issue set forth above that, except for the first issue, are issues of first impression in this district and in the State of Montana, it provides the following general comments and conclusions. Pursuant to the Uniform Commercial Code adopted in Montana, the principles of law and equity, unless displaced by the particular provisions of this code, shall supplement its provisions. MONTANA CODE ANNOTATED ("MCA") § 30-1-103. As to subordinated obligations, MCA § 30-1-209 provides that "[a]n obligation may be issued as subordinated to performance of another obligation of the person obligated, or a creditor may subordinate its right to performance of an obligation by agreement with either the person obligated or another creditor of the person obligated. Subordination does not create a security interest as against either the common debtor or a subordinated creditor." The official comments

6

to this section affirms that "[s]ubordination agreements are enforceable between the parties as contracts. . . . The enforcement of subordination agreements is largely left to supplemental principles under Section 1-103 [30-1-102(1) and 30-1-103]." Lastly, MCA § 30-9A-339 provides that "[chapter 9A] does not preclude subordination by agreement by a person entitled to priority." The official comments to this section provides: "This section makes it entirely clear that a person entitled to priority may effectively agree to subordinate its claim. Only the person entitled to priority may make such an agreement: a person's rights cannot be adversely affected by an agreement to which the person is not a party."

     1. **Does JBC have a lien, whether equitable or based on Article 9 or any other right, on the insurance proceeds due to the fact that NET failed to name JBC as a loss payee, although required under its security agreement with NET?**

     TRB acknowledges in its pretrial memorandum that JBC has an equitable lien on the insurance proceeds as JBC has a duly perfected UCC security interest and NET contractually agreed to name JBC as a loss payee, which NET failed to do. *See* Ex. F, section 14(a), page 7, and *Am. Eq. Assurance Co. v. Newman* (1957), 132 Mont. 63, 313 P.2d 1023, 1027. ("If the buyer, who is under obligation by his contract, as here, to keep the property insured for the benefit of the seller, neglects to do so then the courts will enforce an equitable lien upon any insurance carried by the buyer to protect the seller of this assignee."). TRB however contends that any such lien is subordinate to TRB's interest in the proceeds. The subordination of any lien will be discussed below. The Court finds that JBC has a duly perfected UCC security interest, Ex. D, and that NET agreed to name JBC as a loss payee, Ex. F, page 7, and failed to so. Based upon the foregoing facts and the case law, the Court concludes that JBC has an equitable lien in

7

the insurance proceeds.

2. **Does a named loss payee on an insurance policy have a direct contractual interest in insurance proceeds that is superior to either a UCC or equitable lienholder's interest in the same proceeds?**

The Montana Supreme Court provided the following instructive comment in *Mont. Petroleum Tank Release Comp. Bd. v. Capitol Indem. Co.*, 2006 MT 133 ¶ 29, 332 Mont. 352 ¶ 29, 137 P.3d 522 ¶ 29:

> A loss payee is generally the party to whom money or insurance proceeds is to be paid in the event of a loss. *See e.g., Bartlett v. Allstate Ins. Co.* (1996), 280 Mont. 63, 929 P.2d 227. A loss payee is defined as:
>
>> [A] mere appointee to receive the proceeds to the extent of his interest . . . dependant upon the existence of an insurable interest in such appointee . . . it makes the policy subject to any act or omission of the insured which might void, terminate, or adversely affect the coverage; and if the policy is not collectible by the insured, the appointee, likewise, cannot recover thereunder.
>
> 5A John A. Appleman & Jean Appleman, *Insurance Law and Practice,* § 3335 (1970) (footnotes omitted). Thus, the rights of a loss payee are derivative. [. . .]

This simple/basic loss payee is in contradistinction with a mortgagee payee "who has an independent agreement with the insurer. . . . The mortgagee payee is treated 'just as if [he or she] had applied for insurance entirely independently of the mortgagor.' The choice of which category the payee falls under depends on the language of the insurance clause: a 'standard' or 'union' clause creates a mortgagee payee, while a 'simple' clause creates a loss payee. (Citations omitted.) The main difference is that the loss payee 'is subject to such defenses as the insurer may have against the mortgagor, while the [mortgagee payee] is not.'" *Tower Air, Inc. v. Finova Capital Corp. (In re Tower Air, Inc.)*, 397 F.3d 191, 203 (3d Cir. 2005). The Chubb policy, Ex.

8

4, pp. 75 and 76, establishes that the loss of the personal property that is the subject of this proceeding is governed by a simple/basic loss payee provision as established as follows: the loss payee may only receive recovery if the insured complies with the terms of the insurance and only to the extent on an insurable interest. *See Tower Air*, 397 F.3d at 204, and MCA § 33-15-205.

TRB argues that TRB has a direct contractual interest that has priority over a lienholder either under the Uniform Commercial Code ("UCC") or as a matter of equity. For this argument, TRB cites to *Rick Taylor Timber Co., Inc. v. Orix Credit Alliance, Inc. (In re Rich Taylor Timber Co.)*, 1993 WL 13003868 (Bankr. S.D.Ga. 1993) (priority under the UCC) and *Williams v. Rutherford (In re Rutherford)* 73 B.R. 665 (Bankr. W.D. Mo. 1986) ( priority as a matter of equity). In *Rick Taylor*, one creditor, Orix, did not have a perfected interest in a Feller buncher, but was named as a loss payee under an insurance policy. A bank held a perfected security interest in the Feller buncher, but was not a named loss payee. The court in *Rick Taylor* concluded that Orix held an original interest in the insurance policy as it was named as the loss payee and it consequently was not essential that Orix needed to hold a perfected security interest as its interest in the insurance policy arose outside of the UCC pursuant to UCC § 9-104(g) [provides what is excluded from Article 9] [Similar to MCA § 30-9A-109(4)(h)]." ("A transfer of an interest in or claim in or under any policy of insurance, except as provided with respect to proceeds (Section 9-306) [MCA §§ 30-9A-315 and 30-9A-102(1)(lll)] and priorities in proceeds (Section 9-312) [MCA § 30-9A-322.]"). *Rick Taylor*, 1993 WL 13002868 *6 and *7. Such provision is similar to MCA § 30-9A-109(4)(h) that provides: "This chapter does not apply to . . . a transfer of an interest in or an assignment of a claim under a policy of insurance, . . . , but 30-9A-315 and 30-9A-322 apply with respect to proceeds and priorities in proceeds[.]" This

9

inapplicability provision "only applies to 'a direct security interest in an insurance policy by making the policy itself the immediate collateral securing the transaction.'" *PPG Indus., Inc. v. Hartford Fire Ins. Co.*, 531 F.2d 58 (2nd Cir.1976). Furthermore, it specifically excepts from its application the derivative insurance proceeds described in § 47-9306." *In re Tower Air, Inc.*, 268 B.R. 404, 408 (Bankr. D. Del. 2001).

In Montana, MCA § 30-9A-102(1)(lll) replaces MCA § 30-9-306, pursuant to the 1999 amendments. The official comments for the "proceeds" amendment, Comment 13, provides: "The revised definition of 'proceeds' expands the definition beyond that contained in former Section 9-306 [30-9-306, now repealed, see 30-9A-102]. . .". Proceeds, under MCA § 30-9A-102(1)(lll), means the following property: "(i) whatever is acquired upon the sale, lease, license, exchange, or other disposition of collateral; . . . and (v) to the extent of the value of collateral and to the extent payable to the debtor or the secured party, insurance payable by reason of the loss . . . of . . . or damage to the collateral." The court in *Rick Taylor* concluded that Orix had an original interest arising from the fact that it was named a loss payee and that the validity of its interest in the policy was not subject to Article 9. The court further concluded that the secured bank had a derivative interest governed by the U.C.C. as the bank never received a loss payee endorsement. *See Rick Taylor*, 1993 WL 13003868 *7.

This Court analyzes the issue differently than the court in *Rick Taylor*, but ultimately reaches the same result. Pursuant to the instruction of *Mont. Petroleum Tank Release Comp. Bd.*, TRB, as a designated loss payee, has a derivative right as an appointee to the insurance proceeds to cover any loss insured through the Chubb policy obtained by NET. TRB did not take a direct contractual assignment or transfer of this particular insurance policy that would be

10

excluded under the U.C.C. pursuant to MCA § 30-9A-109(4)(h). *See PPG Indus., Inc. v. Hartford Fire Ins. Co.*, 531 F.2d 58 (2nd Cir.1976). TRB instead was named a loss payee and perfected a security interest in the policy. The Court concludes in reviewing the financing statement filed by TRB and NET, Ex. 1, page 4, that TRB knew how to effectuate a direct assignment as it took an assignment in a life insurance policy from Midland National Life in the name of John G. Alt, but took a security interest in insurance proceeds. Consequently, TRB, not having a direct contractual assignment of the insurance policy, but as a named loss payee, and as any other named loss payee, i.e. JNI, would have, has standing to enforce the loss payable provision without relying on NET to make claim for the proceeds, provided NET has done nothing to affect coverage and TRB has an insurable interest. Once the proceeds are received by the insured or the loss payees then the provisions of MCA §§ 30-9A-315, -322, and -102(1)(lll) provide the mechanism to determine which entity receives all or a portion of the proceeds, if more than one loss payee exists and if the loss payees also have perfected security interests. In this case JBC is not a named loss payee and only has an equitable lien and a security interest in the proceeds subordinate to the two loss payees, TRB and JNI, and their respective perfected security interests in the insurance proceeds.

The Montana Supreme Court, in a real property and trust indenture case, *Amsterdam Lumber, Inc. v. Dyksterhouse*, 179 Mont. 133, 143, 586 P.2d 705, 711 (Mont. 1978), discusses the effect of an equitable lien,

> We hold therefore, the trust indenture in this case is a defective trust indenture
> which will be enforced between the parties as an equitable lien; but the lien of
> such defective trust indenture is subordinate to the claims of subsequent
> encumbrancers and of judgment creditors who extended credit subsequent to the
> date of the instrument, without actual knowledge of the existence of the indenture.

11

Although *Amsterdam Lumber* is a real property case, the court does explain the status of an equitable lien in reference to other liens, which the Court in the case *sub judice*, believes is instructive. As JBC is not a named loss payee but has an equitable lien and a subordinate security interest in the proceeds, such lien and security interest is subordinate to the named loss payees and to their perfected security interests. Later, the Court discusses how this conclusion is altered by the subordination agreement between TRB and JBC.

In considering whether TRB, as a loss payee, has a superior interest to the insurance proceeds to the equitable lien held by JBC, the Court considers the above analysis and note 1 contained in *Williams v. Rutherford (In re Rutherford)*, 73 B.R. 665, 670 (Bankr. W.D. Mo. 1986), also a property case, and concludes that TRB does have a superior interest as it is not only a named loss payee, but is also a first lienholder which trumps the equitable lien and the third lien interest held by JBC, an unnamed loss payee.

As TRB is the first named loss payee and first lienholder, the Court concludes, based upon the foregoing, that TRB has a derivative right as appointee (loss payee) in the insurance proceeds that is superior to either a third lien interest under the U.C.C. or an equitable lienholder's interest in the same proceeds. The Court does not conclude that TRB has a direct contractual interest in the context of *PPG Indus., Inc.*, by having a direct transfer or assignment of the Chubb policy, but has a derivative right to receive the insurance proceeds through the loss payee provision. *See* Ex. 4-1. Morever, NET has done nothing to void, terminate, or adversely affect the coverage, even though it failed to adequately confirm that JBC was added to the Chubb policy as a loss payee. In fact, the insurer paid the policy proceeds without disputing any conduct

12

by NET.

3. **Did TRB subordinate its interest in the insurance proceeds to JBC?**

On July 15, 2005, TRB and JBC agreed as follows:

> Three Rivers Bank of Montana agrees to subordinate to Johnson Brothers Contracting the attached list of mill machinery and equipment until the $300,000 is paid in full by John G. Alt and North End Timber Productions, LLC. All other machinery, equipment, assignments, agreements, covenants, note renewals, and conditions will remain in force.

*See* Ex. 3-1 through 3-3. If no subordination agreement existed between TRB and JBC, TRB would receive the insurance proceeds to the extent of the value of its collateral. However, a subordination agreement does exist between TRB and JBC that the Court must consider. Given the prefatory discussion above concerning the contractual and equitable principals that must be applied in considering a subordination agreement, the Court concludes that it must apply the contractual and equitable principles set forth in MCA §§ 30-1-103, 30-1-209, 30-9A-339 and applicable official comments. The subordination agreement between TRB and JBC is a contract enforceable by either or both parties. *See* MCA §30-1-209. The subordination agreement, Ex. 3, is typed on TRB letterhead and appears to have been prepared by a bank employee or officer. Such agreement will be most strongly interpreted against the preparer of the document. *See* MCA § 28-3-206.

Generally subordination agreements may be classified as being one of two types: debt subordinations or property interest subordinations. *See In re Lantana Motel*, 124 B.R. 252, 255 (Bankr. S.D. Ohio 1990). Judge Sellers, in *Lantana*, discusses the differences between the two types of subordination:

13

> In a debt subordination, the agreement provides that the subordinated creditor's right to payment and collection will be subordinate to the rights of another claimant. If the debt subordination is "complete," the subordinated creditor is barred from receiving payments until the superior debt is paid in full.
>
> Debt subordinations are routinely utilized when a corporate or partnership borrower seeks financing from a commercial lender. The commercial lender will insist that all indebtedness of the corporation or partnership to management or other insiders be subordinated to the lender's proposed financing. The lender demands subordination for reasons more than just security; the lender wants its loans to be used as working capital in the borrower's business and not just to repay insider debts.
>
> Debt subordination should be contrasted to property interest subordination. In a property interest subordination, the agreement affects only the relative rights of parties in particular real or personal property. Property interest subordination does not concern any rights the parties may have to receive payments.
>
> The most common type of property interest subordination is lien subordination. By executing a lien subordination agreement, the subordinating party agrees to demote the priority of its lien to that of another secured creditor, thereby delaying its recourse to the identified collateral until the other party's secured claim has been satisfied. *See,* U.C.C. § 9-316 [MCA § 30-9A-339]. In a pure lien subordination, the subordinating party's right to receive payments is not limited.

*Id.*, 124 B.R. at 255-56. Additional property interest subtypes may exist, i.e., mortgagee-tenant subordination, but they are not relevant to the contested issues. The TRB and JBC subordination states TRB "agrees to subordinate to [JBC] the attached list of mill machinery and equipment." The Court concludes such quoted language establishes a property interest subordination involving a lien subordination and not a debt subordination. No evidence exists in the record that TRB agreed to forego periodic payments on its debt with NET or to forego collection until JBC was paid in full. The attachments to TRB's proofs of claim 9-1 and 10-1 and -2 indicate that it did receive and apply periodic or cash collateral payments. At most TRB agreed to demote or subordinate its lien in identified equipment, Ex. 3-2 and 3-3, to the lien of JBC and thereby delay

14

its recourse to the identified collateral until JBC's secured lien was satisfied. *See In re Plymouth House Health Care*, 2005 WL 2589201, *7 (Bankr. E.D. Pa. 2005). The Court concludes that TRB's first lien position is subordinated to JBC's secured lien interest, notwithstanding the fact that JBC's security interest, without the subordination, holds a perfected third lien position inferior to the perfected secured interests held by TRB (1st) and JNI (2nd).

The next question involves whether TRB subordinated to JBC its lien interest in the insurance proceeds. TRB's Commercial Security Agreement with NET, Ex. A-1, specifically grants a security interest in the identified collateral described in the agreement. JBC's Security Agreement and Succeeding Supply Agreement with NET, Ex. F, specifically grants a security interest in identified collateral. Through Ex. 3-1 through 3-3, TRB and JBC agreed that TRB subordinated to JBC specifically identified collateral. The Court concludes that if Ex. 3 is to have any meaning, TRB subordinated its security interest in the listed collateral to JBC until JBC received $300,000. Such subordination includes proceeds. *See Conagra, Inc. v. Farmers State Bank*, 602 N.W.2d 390, 401 (Mich.Ct.App 1999).

As previously determined by this Court, the subordination agreement represents a lien subordination of a security interest and includes identifiable proceeds of collateral. *See* MCA § 30-9A-315. By definition proceeds includes "to the extent of the value of collateral and to the extent payable to the debtor or the secured party, insurance payable by reason of the loss or nonconformity of, defects in, or damage to the collateral." *See* MCA § 30-9A-102(lll)(v). The parties by stipulated fact agree that the proceeds paid by Chubb relate to the loss of personal property at the NET site. Through stipulated fact 15, the parties agree "[o]f the equipment destroyed in the fire, $104,000 worth was listed in the July 15, 2005, Subordination Agreement

15

between the TRB and JBC and identified in JBC's lien." The parties have identified the portion of insurance proceeds that corresponds to the value of the lost collateral described in the attached list of equipment, Ex. 3, also included in JBC's lien. *See Conagra*, 602 N.W.2d at 400. ("By analogy, the cash proceeds of the beans did not loss their identity merely because they were 'commingled' in a lump-sum payment with cash proceeds from other crops, as long as we can determine how much of the payment is connected to the bean crop."). The Court concludes from the agreed facts that a determination can be made that $104,000 of the insurance proceeds were payable for lost collateral associated with JBC's lien and TRB is entitled to receive the remaining $46,000 of the insurance proceeds held on deposit with the Bankruptcy Clerk of Court as the proceeds in question are insufficient to pay TRB's security interest in full.

    4. **Is Jobs Now's interest in the insurance proceeds superior to JBC's?**

The Court considers the following instructive analysis contained in *ITT Diversified Credit Corp. v. First City Capital Corp.*, 737 S.W.2d 803, 804 (Tex. 1987) persuasive, in a case involving a first lienholder subordinating to a third lienholder.

> In a non-real property situation, the third lienholder should be able to succeed to that part of the interest that was subordinated by the first lienholder, so long as the second lienholder is neither burdened nor benefitted by the subordination agreement. For example, A, B and C have claims against the debtor which are entitled to priority in alphabetical order. "A" subordinates his claim to "C." After foreclosure of the secured interest, the resulting fund is insufficient to satisfy all three claims. The proper distribution of the fund is as follows.
>
> 1. Set aside from the fund the amount of "A" 's claim.
>
> 2. Out of the money set aside, pay "C" the amount of its claim, pay "A" to the extent of any balance remaining after "C" 's claim is satisfied.
>
> 3. Pay "B" the amount of the fund remaining after "A" 's claim has been set aside.

16

4. If any balance remains in the fund after "A" 's claim has been set aside and "B" 's claim has been satisfied, distribute the balance to "C" and "A".

*See* Gilmore, *Security Interests in Personal Property* § 39.1 at 1021 (1965).

Thus, "C", by virtue of the subordination agreement, is paid first, but only to the amount of "A" 's claim, to which "B" was in any event junior. "B" receives what it had expected to receive, the fund less "A" 's prior claim. If "A" 's claim is smaller than "C" 's, "C" will collect the balance of its claim, in its own right, only after "B" has been paid in full. "A", the subordinator, receives nothing until "B" and "C" have been paid except to the extent that its claim, entitled to first priority, exceeds the amount of "C" 's claim, which, under its agreement, is to be first paid.

*See also Kobak v. National City Bank (In re Kobak*, 280 B.R. 164, 170 (Bankr. N.D. Ohio 2002) (Second lienholder was not a party to the subordination agreement involving a first and a third lienholder and "therefore its position should not be impaired or enhanced by that agreement."), and MCA § 30-9A-339 and the official comments to such section. JNI's security interest can be neither impaired nor enhanced as it was not a party to the subordination agreement between TRB and JBC. The insurance proceeds of $150,000 are less than the TRB debt or the value to which it would be entitled to receive if it had not subordinated its interest to JBC.

Based upon the foregoing analysis in *ITT*, the Court concludes that JNI's interest in the insurance proceeds is not superior to JBC's.

5. **If JBC's lien has priority, does its priority extend to the wiring and support structure not identified in the Subordination Agreement with the Bank?**

Ex. 3-1, the subordination agreement between TRB and JBC including the two pages of attachments, Ex. 3-2 and 3-3, does not describe any wiring and support structure. Pursuant to this Court's analysis, TRB only subordinated it security interest in the items listed in the attachments to the subordination agreement. As to any other collateral, the subordination

17

agreement provides "[a]ll other machinery, equipment, assignments, agreements, covenants, note renewals, and conditions will remain in force." The Court concludes that TRB, based upon the foregoing quoted language, contractually preserved its first lien position in all other collateral, including the wiring and support structure. Such an interpretation does not create an absurdity, MCA § 38-3-401, gives effect to the mutual intention of the parties as it existed at the time of execution of the subordination agreement, MCA § 28-3-301, as the parties did not include wiring and support structure in the list of equipment attached to Ex. 3, preserves the integrity of the written subordination agreement, MCA § 28-3-303, and extends only to the list of equipment the parties intended to include in the subordination agreement, MCA § 28-3-305.

Based upon the foregoing memorandum, the Court will issue a separate Judgment as follows:

IT IS ORDERED that a separate Judgment will be issued consistent with the Memorandum of Decision, dated December 17, 2007, providing that:

IT IS ORDERED, Adjudged, Declared, and **JUDGMENT** is hereby entered as follows:

1. Plaintiff Three Rivers Bank of Montana shall receive a distribution of $46,000 from the funds held on account by the Clerk of Court derived from the deposit of $150,000 previously received by the Clerk of Court in this adversary proceeding.

2. Defendant Johnson Brothers Contracting, Inc. shall receive a distribution of $104,000 from the funds held on account by the Clerk of Court derived from the deposit of $150,000 previously received by the Clerk of Court in this adversary proceeding.

3. Defendant Jobs Now, Inc. shall not receive any distribution from the funds held on account by the Clerk of Court derived from the deposit of $150,000 previously received by the

18

Clerk of Court in this adversary proceeding.

4. Defendant North End Timber, LLC is dismissed from this adversary proceeding, pursuant to the provision of the approved pretrial order.

5. The parties shall be responsible for their own attorneys fees and costs.

6. The Clerk of Court, upon this Judgment becoming final, shall disburse a check payable to Johnson Brothers Contracting, Inc., and its attorneys at its attorneys' address, in the amount of $104,000, and shall disburse a check payable to Three Rivers Bank of Montana, and its attorneys at its attorneys' address, in the amount of $46,000 from funds on deposit with the Court.

BY THE COURT

*Ralph B. Kirscher*

HON. RALPH B. KIRSCHER
U.S. Bankruptcy Judge
United States Bankruptcy Court
District of Montana